NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

ARTURO SANCHEZ PEREZ, JR., *Appellant.*

No. 1 CA-CR 22-0111
FILED 3-12-2024

Appeal from the Superior Court in Maricopa County
No. CR2017-002742-001
The Honorable Timothy J. Ryan, Judge

**CONVICTIONS AFFIRMED; REMANDED FOR RESENTENCING**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Deborah Celeste Kinney
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Aaron J. Moskowitz
*Counsel for Appellant*

**MEMORANDUM DECISION**

Judge Angela K. Paton delivered the decision of the Court, in which Presiding Judge Michael J. Brown and Judge Andrew M. Jacobs joined.

**P A T O N**, Judge:

¶1 Arturo Perez appeals his convictions and sentences for two counts of first-degree murder and one count of first-degree burglary and requests a new trial. We affirm Perez's convictions and first-degree burglary sentence. We remand the first-degree murder convictions for resentencing.

**FACTS AND PROCEDURAL HISTORY**

¶2 We view the facts in the light most favorable to sustaining the jury's verdicts, resolving all inferences against Perez. *See State v. Reaves*, 252 Ariz. 553, 558, ¶ 2 (App. 2022).

¶3 Around midnight on June 16, 2017, Perez broke into John's[1] apartment with a gun. While John and Jane were resting in the bedroom, Perez opened the bedroom door and shot Jane five times, instantly killing her. Perez and John wrestled from the bedroom to the living room, during which Perez shot John several times.

¶4 A neighbor called the police after hearing the break-in and gunshots. Upon arrival, the officers found John lying on the living room floor. He was conscious and breathing despite having multiple gunshot wounds. An officer asked John who had shot him, to which he immediately responded, "Arturo Perez." The officer also asked how John knew Perez, and John said he had known Perez since the fourth grade.

¶5 An ambulance transported John to the hospital, and before leaving the ambulance bay, an officer showed John a photograph of Perez. The officer asked John, "who is that?" John responded, "Arturo." The officer asked what Perez did, to which John replied, "he shot me." John was then taken into trauma surgery.

---

[1] We use pseudonyms to protect the identities of the victims and witnesses.

¶6        John was paralyzed from the neck down from a gunshot wound that went through his larynx and into his esophagus and spinal cord. His liver was damaged, and surgeons removed his kidney due to active bleeding. Shortly after surgery, a detective interviewed John in his hospital room. The detective used an alphabet board to communicate with John because John could only grunt and blink to answer questions. John spelled out that it was Perez who shot him and Jane. He also spelled out that Perez's cousin, Leo, broke into the house with Perez. The medical staff then intubated John and placed him into a medically-induced coma. He endured several procedures over the next few days.

¶7        Five days after the alphabet board interview with the detective, John could speak with the assistance of a medical device, and the detective returned for an audio-recorded interview. The detective asked John several "yes" or "no" questions, starting with whether it was Perez who shot him. John responded "yes." The detective then asked whether it was Perez who shot Jane, and whether John saw Perez shoot Jane; John replied "yes" to both questions. The detective also asked whether there was someone else with Perez; John responded that Leo was with Perez. Medical staff intervened after about ten minutes because John struggled to answer questions. The next day, John became unresponsive. He died from his injuries the following week.

¶8        A grand jury indicted Perez for two counts of first-degree murder (counts 1 and 2) and one count of first-degree burglary (count 3). On the first day of trial, Perez moved to preclude the use of "[a]ll statements made by [John] that do not satisfy the requirements of the dying declaration or excited utterance exception." During a discussion on his motion in limine the following day, Perez conceded the statements John made in his apartment and the ambulance bay were admissible under hearsay exceptions but argued the alphabet board communications and the audio-recorded interview were inadmissible hearsay.

¶9        The State argued that "[j]ust because [John] was in the hospital doesn't mean he was no longer under belief of impending death." As to the alphabet board communications, the State explained that John made them the same day as the shooting while intubated and unable to speak. Perez argued the State needed to lay more foundation regarding the circumstances at the hospital. Perez then noted his primary objection concerned John's recorded interview, and argued John had four days of treatment between the first and second interviews and there was no indication John believed his death to be imminent. The State maintained John's recorded statements were, essentially, repeated information with

more detail, captured before he lost consciousness and died from his injuries.

¶10        On the second day of trial, the State filed a written response to Perez's motion, arguing that all of John's statements, including the hospital statements, were "about the cause or circumstances of [John's] death," and thus should be admitted under the dying declaration exception or, alternatively, under the residual hearsay exception. *See* Ariz. R. Evid. 804(b)(2), 807.

¶11        The court denied Perez's motion in limine, finding John's hospital statements admissible as dying declarations under *State v. Adamson*, 136 Ariz. 250 (1983), and under the residual hearsay exception, Ariz. R. Evid. 807. The court found that because the detective recorded John's verbal interview, the court had "independent [trust]worthiness of what was said, how it was said, at the time it was said." And because the State could identify what the alphabet board was and how it was used, John's alphabet board statements were also admissible.

¶12        On the eleventh day of trial, the defense called Leo's mother, Valerie, as an alibi witness, although she was not named in the parties' pre-trial statement. Valerie testified she was with Leo and Perez the night John and Jane were killed. During cross-examination, the State asked Valerie whether the phone number ending in -5948 was hers in 2017, and she responded that she was not sure. The next morning, Perez informed the court that the State had just sent over a supplemental report showing the phone number was in fact registered to Valerie in 2017. The report also contained Leo's cell phone call detail log, which showed incoming and outgoing calls to the number ending in -5948. By showing that the number was registered to Valerie, the State intended to rebut Leo and Valerie's testimony that they were together the night of the murders.

¶13        Perez asked the court to preclude any testimony regarding efforts to verify whether the phone number belonged to Valerie, arguing the State had this information for years and never disclosed its attempts to identify the owner of the number. The court denied Perez's request, stating the defense should have disclosed Valerie as a witness earlier than during trial and the State was permitted to rebut her testimony with this information.

¶14        Perez also objected to the admission of Leo's call detail log. He argued the State did not timely disclose the records and argued they were hearsay. Perez also argued the call detail log did not have a

foundational witness to establish authenticity and was not self-authenticating. The court determined the call detail log was not untimely disclosed—given that it was offered in response to the defense's untimely disclosure of Valerie as a witness—and later admitted it into evidence. To authenticate the call detail log, the State called the detective actively working on the case who had previously examined the call detail log.

¶15        After a 16-day trial, a jury found Perez guilty of two counts of first-degree murder (counts 1 and 2) and one count of first-degree burglary (count 3). During sentencing, John and Jane's family members submitted victim impact statements. Jane's father and sister asserted Perez did not show remorse or take responsibility. Perez reasserted his innocence and said he could not accept responsibility for the crimes committed.

¶16        The superior court found four mitigating factors—including Perez's young age, lack of criminal history, fatherhood, and the support from his friends and family throughout the trial. The court also found two aggravating factors—including the number of victims and emotional trauma to the victims' next-of-kin.

¶17        The court said the law required a sentence of natural life imprisonment for each first-degree murder count, but that it had to decide whether to impose concurrent or consecutive sentences. *See* A.R.S. §§ 13-711(A), 13-752(A). The court also told the parties that, in determining whether to impose concurrent or consecutive sentences, it must consider other factors besides the mitigating and aggravating circumstances.

¶18        The court stated:

> [The victims' families are] just wondering why it happened
> . . . and why there's no remorse, and the Court finds there is
> no remorse, and . . . because there's no remorse and no
> recognition of the beyond a reasonable doubt convictions of
> the jury, the Court finds it appropriate to follow the State's
> recommendation to make the life sentences in count 1 and
> count 2 consecutive to each other.

Perez did not contest or address the court's consideration of his lack of remorse. The court sentenced Perez to 5 years' imprisonment for the first-degree burglary count, concurrent with the natural life sentence in count 2.

¶19        Perez timely appealed, and we have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") Sections 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

## DISCUSSION

¶20        Perez argues the superior court: (1) abused its discretion in admitting John's hospital statements under hearsay exceptions, (2) abused its discretion by admitting the call detail log, and (3) fundamentally erred by considering Perez's lack of remorse in imposing consecutive sentences on the first-degree murder counts.

**I.        The superior court did not abuse its discretion by admitting John's hospital statements.**

¶21        Perez argues the superior court incorrectly admitted John's hospital statements because, unlike the statements made at his apartment and in the ambulance bay, the alphabet board statements and recorded interview statements were not made under a belief of imminent death. The court ruled that, based on the circumstances surrounding the hospital interviews, John's statements were admissible as dying declarations under *State v. Adamson*, 136 Ariz. 250 (1983), and also under the residual exception in Rule 807 of the Arizona Rules of Evidence. We review the court's admission of evidence for an abuse of discretion. *See State v. Fischer*, 219 Ariz. 408, 416, ¶ 24 (App. 2008).

¶22        Generally, out-of-court statements offered to prove the truth of the matter asserted are inadmissible unless an exception to the rule against hearsay applies. Ariz. R. Evid. 801(c), 802, 804. Pursuant to Rule 804(b)(2), "statement[s] under the belief of imminent death" "are not excluded by the rule against hearsay if the declarant is unavailable as a witness." This rule requires that the statement (1) be used in a homicide prosecution or in a civil case, (2) was made while the declarant believed death was imminent, and (3) concerned the cause or circumstances of the death. *Id.*; *see also Adamson*, 136 Ariz. at 254. As with other declarations under the hearsay rules, the declarant "must have had an opportunity to observe or personal knowledge of the fact declared." *Adamson*, 136 Ariz. at 255; *see also* Ariz. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

¶23        The State asserts that John's statements met the foundational requirements of Rule 804(b)(2) because his injuries were severe and he endured several critical procedures while at the hospital. During his alphabet board communications, John could not breathe normally or speak; he could only grunt and blink to communicate with the detective. After this brief interaction, medical staff intubated him and placed him into a

medically-induced coma. As for the recorded interview, John was only able to physically answer questions for about ten minutes with the assistance of a medical device.

¶24 The law does not require a declarant to make an assertion "that he is dying at the time the statements [are] made." *Adamson*, 136 Ariz. at 254. "The party offering dying declarations may show that the victim was under a sense of impending death either by express language . . . or by the indubitable circumstances," which may include being in "grave condition." *Id.* at 254-55.

¶25 John had been shot five times, including in the neck, thoracic vertebrae, arm, thigh, and torso. His liver was damaged, and the doctors removed one of his kidneys. The doctors performed a tracheoscopy to aid his breathing after he was critically sedated; he could not breathe or speak normally during his communications with the detective. At trial, the State used the statements to show the circumstances of John's death, and specifically, that John consistently identified Perez as the shooter.

¶26 On this record, the court did not abuse its discretion in admitting John's hospital statements, as the circumstances compel the conclusion that John believed he was dying. *See Adamson*, 136 Ariz. at 255 ("At the time of the statements [Victim] was in grave condition in the intensive care unit. Under these conditions it is reasonable to conclude that when the statements were made [Victim] was under a sense of impending death."). And even if the court erred in admitting John's hospital statements, any error was harmless because it was cumulative to John's earlier identification of Perez as the shooter. *See State v. Williams*, 133 Ariz. 220, 226 (1982).

**II.   The superior court did not abuse its discretion by admitting the call detail log.**

¶27 Perez argues the superior court abused its discretion by denying Perez's request to preclude Leo's call detail log as evidence. He argues the State did not timely disclose the call log and could not present sufficient foundation for its admission. The State contends that Perez did not object to the call detail log on hearsay grounds below. The record shows Perez did object below. We review the court's admission of evidence and its ruling on authentication for abuse of discretion. *See Fischer*, 219 Ariz. at 416, ¶ 24 (admission of evidence); *State v. Forde*, 233 Ariz. 543, 563, ¶ 74 (2014) (authentication ruling).

¶28        Following Perez's objections to the admission of the call detail log, the court proposed the following limiting instruction be offered to the jury at that time:

> You have heard evidence from information extracted or taken from cell phone and cell phone records. This is admitted for the limited purpose of understanding the course of the investigation, what was learned during the investigation, what steps were or were not taken, why, and evaluating the reasonableness of the decision-making process; therefore, you must consider this information only for these limited purposes. If and when a witness is asked to state whether or not they recognize a cell phone number, you may consider that evidence as it relates to credibility.

Perez's counsel responded he would "rather work on it" versus give it to the jury at that time. The court then noted it was the parties' "homework" to prepare potential limiting instructions regarding the call detail log and "draft up what they propose would be the appropriate limiting instruction." Perez never returned to the issue.

¶29        Evidence is supported by proper foundation when the proponent offers sufficient evidence to support a finding that the evidence is what the proponent claims it to be. Ariz. R. Evid. 901(a); *see also Forde*, 233 Ariz. at 563, ¶ 74. When the superior court rules on authentication it "does not determine whether the evidence is authentic, but only whether evidence exists from which the jury could reasonably conclude that it is authentic." *State v. Lavers*, 168 Ariz. 376, 386 (1991). A party can satisfy this requirement in the following ways: a witness can testify the item is what it is claimed to be, Ariz. R. Evid. 901(b)(1), or the evidence can be shown to have distinctive characteristics which, taken in conjunction with the circumstances, support a finding it is what its proponent claims, Ariz. R. Evid. 901(b)(4).

¶30        The detective testified that after submitting a request to Sprint for Leo's cell phone records, he received an information sheet from Sprint with instructions on how to read the call detail log. The detective used this instruction sheet to read the records he received. He also testified about his involvement in the case and to his experience interpreting similar records related to Perez's case and in other cases. This was sufficient to authenticate the call detail log under Rule 901(a). *See Forde*, 233 Ariz. at 563–64, ¶¶ 74–75 (rejecting the defendant's argument that the State failed to authenticate phone records when the detective who examined the phone's contents

"learned from the cell phone provider that [defendant] was the registered subscriber for the phone number listed").

**¶31**    Perez's hearsay arguments are likewise unavailing.  On appeal, Perez seems to argue that the court improperly admitted the call detail log under the business records exception.  But the record does not show the court admitted the call detail log under this exception, and Perez offers no record or legal citation supporting his argument.

**¶32**    At trial, the court proposed a limiting instruction for the call detail log, to which Perez's counsel responded he would "rather work on it."  Any potential prejudice Perez may have suffered could have been remedied by accepting the court's invitation to adopt a limiting instruction. He declined the court's offer to immediately provide a specific limiting instruction and did not follow up before final jury instructions.  On this record, the court did not abuse its discretion in admitting the call detail log.

## III.    The superior court erred in its sentencing determination for the first-degree murder counts.

**¶33**    The State concedes the superior court erred when it based its consecutive sentencing determination for the first-degree murder counts on Perez's lack of remorse and failure to recognize the jury's verdicts.  In sentencing a defendant, a court may not consider his lack of remorse or failure to admit guilt.  *State v. Trujillo*, 227 Ariz. 314, 318, ¶¶ 13–14 (App. 2011).

**¶34**    We review arguments raised for the first time on appeal for prejudicial, fundamental error.  *State v. Escalante*, 245 Ariz. 135, 140, ¶ 12 (2018).  Perez contends we should review his claim for abuse of discretion, citing *State v. Vermuele*, 226 Ariz. 399, 401–03, ¶¶ 6–14 (App. 2011) (concluding a defendant does not forfeit ordinary appellate review by failing to object during or after the imposition of a sentence).  The State argues we should review for fundamental error because Perez failed to object, asserting this court wrongly decided *Vermuele*.

**¶35**    *Vermuele* is inapposite here.  Unlike *Vermuele*, here, the defense had an opportunity to object to the court's consecutive sentencing determination. Following its sentencing determination, the court asked the defense if it had "anything else" regarding the sentencing orders, to which Perez's counsel responded, "[n]o" and "[t]hank you."  Perez had an opportunity to object, so we review for prejudicial, fundamental error.  *See Trujillo*, 227 Ariz. at 317, ¶ 9 (reviewing the superior court's consideration

of lack of remorse at sentencing for fundamental error when the defendant did not raise the issue below).

¶36     The sentencing court commits fundamental error if it imposes an aggravated sentence based in part on a prohibited aggravating factor. *See id.* at ¶ 15. Unless the defendant raises the issue, the court may not consider lack of remorse as an aggravating factor, *id.* at 317–18, ¶¶ 9, 11–15, because "[a]s contrition or remorse necessarily imply guilt, it would be irrational or disingenuous to expect or require one who maintains his innocence to express contrition or remorse," *State v. Hardwick*, 183 Ariz. 649, 656 (App. 1995). Here, the court explicitly referred to Perez's lack of remorse in its decision to impose consecutive sentences for the first-degree murder counts, stating, "because there's no remorse and no recognition of the beyond a reasonable doubt convictions of the jury, the Court finds it appropriate to follow the State's recommendation to make the life sentences in count 1 and count 2 consecutive to each other."

¶37     We will uphold the superior court's sentencing determination "only where the record clearly shows the trial court would have reached the same result even without consideration of the improper factors." *Hardwick*, 183 Ariz. at 656–57 (citation omitted). As the State concedes, the record does not show that the court would have reached the same decision without consideration of lack of remorse and failure to recognize the jury's verdicts. *See State v. Munninger*, 213 Ariz. 393, 396, ¶ 9 (App. 2006). We remand the first-degree murder counts for resentencing in a manner consistent with this decision.

## CONCLUSION

¶38     We affirm Perez's convictions and first-degree burglary sentence. We remand the first-degree murder counts for resentencing.

